The judgment of the United States Customs Court is *affirmed*.

UNITED STATES *v.* SHELL EASTERN PETROLEUM PRODUCTS, INC.
(No. 4124)[1]

[1] C. A. D. 6.

United States Court of Customs and Patent Appeals, April 25, 1938

*Charles D. Lawrence*, Acting Assistant Attorney General (*Ralph Folks*, special attorney, of counsel), for the United States.

*Allan R. Brown* (*Eugene F. Blauvelt* of counsel), for appellee.

*Brooks & Brooks, Lamb & Lerch* (*Frederick W. Brooks, Ernest F. A. Place*, and *Thomas J. McKenna*, of counsel), *amici curiae*, in support of the Government.

*Sharretts & Hillis* (*Edward P. Sharretts* of counsel), *amici curiae*, in support of appellee.

[Oral argument February 11, 1938, by Mr. Lawrence, Mr. McKenna, Mr. Blauvelt, Mr. Sharretts, and Mr. Place]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, and LENROOT, Associate Judges

GARRETT, Presiding Judge, delivered the opinion of the court:[2]

The Government has here appealed from a judgment of the United States Customs Court, First Division, sustaining two protests (the cases being consolidated for trial) filed by appellee against the classification and duty assessment by the Collector of Customs at the port of New York of certain merchandise invoiced as naphthenic acid.

The collector classified it under the last clause of paragraph 1 of the Tariff Act of 1930, reading:

* * * all other acids and acid anhydrides not specially provided for, 25 per centum ad valorem.

The importer's claim, which the trial court sustained, is that the merchandise is classifiable under paragraph 1733 of the act and hence entitled to free entry. The paragraph reads:

PAR. 1733. Oils, mineral: Petroleum, crude, fuel, or refined, and all distillates obtained from petroleum, including kerosene, benzine, naphtha, gasoline, paraffin, and paraffin oil, not specially provided for.

A somewhat voluminous testimonial record was made up in the case, and, by permission of the court, *amici curiae* briefs were filed, two in support of the position of the Government and one in support of the position of appellee. A reply brief by counsel for the Government and a reply thereto by counsel for appellee also were admitted. So the case has been quite fully presented.

The merchandise was imported from Rumania. There is no dispute as to its inherent nature. It is an organic substance, present as such in many, if not all, crude petroleums. Its nature was not altered by any chemical process. It was simply gotten by itself, or separated from other substances, by procedure later herein described. The testimony indicates that it is, in fact, composed of numerous elements

---

[2] JACKSON, Judge, took no part in the consideration or decision of this case.

which are capable of being separated, but that is a factor of no importance here.

It will be observed from reading paragraph 1733, *supra,* that after naming crude petroleum, it provides for—

all *distillates* obtained from petroleum, including kerosene, benzine, naphtha, gasoline, paraffin, and paraffin oil * * *. [Italics ours.]

The record discloses that each of the products or elements so named (kerosene, benzine, etc.), is an organic component of crude petroleum and that it is common practice to separate them by distillation. Each has its distinctive use in industry. It is shown by the record that there is wide range of temperatures at which the various constituents of crude petroleum reach the boiling point, and it is possible as an initial process to separate certain of the crude elements by what is designated "fractional distillation." These fractions are generally referred to as the "gasoline fraction," the "kerosene fraction," the "gas oil fraction," the "lubricating fraction," etc., in the order of the boiling ranges. The gasoline fraction seems to have the lowest boiling point of any of the crude elements and, in some instances, a gasoline suitable for motor fuel can be produced from the crude petroleum by distillation alone. In other instances, however, the gasoline fraction after being distilled must be further fractionated by refining agents. As of course, those components which have the same boiling point will pass from the still as part of the same fraction and such components cannot be separated by distillation alone but require treatment by refining agents. It appears that in all instances the kerosene fraction must be additionally treated after distillation in order to secure commercial kerosene.

The particular product here involved seems in the main to have the same boiling point as kerosene and hence passes from the still along with the kerosene fraction.

On behalf of the importer, the deposition of the manager of the refinery in Rumania, at which the imported merchandise was produced, was taken upon interrogatories, and he gave the following description of the manner in which it was produced:

The naphthenic acids are produced from crude petroleum. The crude petroleum is distilled and three different distillation fractions and a residue are obtained. They are: Benzine, kerosene, distillate, gas oil, and residue. The kerosene distillate and, in some cases, even the gas oil fractions which contain most of the naphthenic acids originally present in the crude petroleum, is treated with the solution of caustic soda prior to any other chemical refining. The separate caustic soda solution which contains the naphthenic acids originally present in the crude petroleum, after a separation of the emulsified hydrocarbons, is treated with sulphuric acid and thereby the crude naphthenic acid results. The crude naphthenic acids are then refined with sulphuric acid (approximately 2 per cent) and they are further refined with clay and filtered. The naphthenic acids are then ready for commercial use.

The testimony of a number of persons familiar with the processes of manufacture in the United States was taken, some on behalf of the Government and some on behalf of the importer. This testimony accords substantially with that of the Rumanian manufacturer, except that one company has a process of producing it by distilling other substances away from it, leaving it in the residue where it is treated chemically.

It appears that the refining agents most generally employed for the separation of all or most of the components of crude petroleum are sulphuric acid and caustic soda.

One of the witnesses on behalf of the Government produced a series of exhibits showing the materials in their different stages. Exhibit G shows the nature of the merchandise at issue. "It consists," as stated in the decision of the trial court, "of a dark, greasy, oily liquid, smelling like tar." Its use is principally for making paint dryers and metallic soaps, some being used in the manufacture of lubricating oils.

The trial court held the case to be controlled by this court's decision in the case of *Borne Scrymser Co.* v. *United States*, 22 C. C. P. A. (Customs) 475, T. D. 47465.

In that case there was involved a product invoiced as "oil residue, mineral." In the course of our decision the method of its production was described as follows:

* * * It fairly appears from the testimony of these witnesses, that in the distillation of crude petroleum by present methods, the distillation processes produce certain so-called fractions, as the distillation proceeds, as follows: Gasoline fraction, kerosene fraction, gas oil fraction, and lubricating fraction. Other fractions are produced, but a further detailing of the same is not deemed important here. The imported product results from a further treatment of the lubricating fraction. It appears, from the record, that it is the practice to refine certain of these fractions, particularly the lubricating fraction, by the application of the usual refining agents, which are, successively, sulphuric acid, alkali, and water. When the lubricating fraction of the distillate is thus refined, as a result thereof two products are procured, a heavy lubricating oil and a thick, dark, tarry sludge. This heavy lubricating oil is again subjected to a sulphonating process as before, and as a result thereof two products are produced: First, a clear, white, odorless mineral oil, such as the product known as "Nujol"; second, the imported product. * * *

The collector's classification there was made under paragraph 56 of the Tariff Act of 1930. One of importer's claims was under paragraph 1733, *supra.* The Government did not contend that the collector's classification was correct but contended rather for classification under paragraph 1558. The Customs Court, First Division, overruled the protest without affirming the classification of the collector, Brown, J., dissenting. The majority opinion was by McClelland, P. J. Our decision reversed that of the trial court, we being of the opinion that the applicable paragraph was 1733, *supra.*

In the course of our decision we said:

The record shows that all petroleum distillation fractions, except the gas oil fraction, are refined before they are ready for commercial use, usually by a sulphuric acid and alkali treatment. Successive refinements produce purer products of the same character. The language of the paragraph plainly includes highly refined gasoline or kerosene equally with those less refined. The paragraph does not delimit the extent of refinement. Likewise, when the lubricating fraction is refined, the limit to which it may be refined is not set by the law. Thus, the highly and many times refined gasoline or white mineral oil is included within the purview of the paragraph. *Schwabacher & Co.* v. *United States*, 22 C. C. P. A. (Customs) 496, T. D. 47484, decided concurrently herewith, Suit No. 3795. Does the statute intend that a highly refined white mineral oil may be admitted free of duty, and its co-product, a coarse, thick oil, as here imported, should be dutiable?

We cannot come to that conclusion. This imported product has not been changed to "chemicals manufactured from petroleums," named in the above-quoted excerpt from Summary of Tariff Information, 1921. It is a distillate obtained from petroleum and refined petroleum. * * *

In the instant case Brown, J., was author of the leading opinion, McClelland, P. J., specially concurring. In applying the rule followed by us in the *Borne Scrymser Co.* case, *supra*, the opinion by Brown, J., *inter alia*, states:

It would be difficult to distinguish on principle the manufacture of this article through distillation and separation by means of caustic soda and sulphuric acid, from the similar manufacture in the *Borne Scrymser* case. The alleged differences are too fine and subtle not to create a doubt in the mind of their soundness, and any such doubt must, under all the authorities, be resolved in favor of the importing taxpayer. Much is made of the proved difference in use between naphthenic acids and kerosene and gasoline and the other articles specifically named which the broad term "all distillates obtained from petroleum" must, by the language, expressly include. This following enumeration is not drawn in the form of limiting words, nor does the paragraph count on or refer to use. Such proof, therefore, will not create or make applicable the rule of *ejusdem generis* here, or limit the broad scope of the language which on its face covers all distillates of petroleum whatever their use. Nor can the fact that naphthenic acids are, or are not, hydrocarbons have any bearing. Nor can the fact that naphthenic acids are proved to be organic acids have any effect on the classification.

There is nothing in the language used, "all distillates obtained from petroleum," that makes these facts a criterion for the exclusion of an article from paragraph 1733.

The concurring opinion of McClelland, P. J., reads:

The evident purpose of the Government in forcing the trial of the issue presented in this case was to retry on a fuller record the issue finally decided in favor of the plaintiff in *Borne Scrymser Co.* v. *United States*, 22 C. C. P. A. 475, T. D. 47465. As an original proposition I would be even more strongly inclined to hold that naphthenic acid was not a distillate of petroleum within the meaning of the free paragraph 1733 than I was that the mineral oil residue in the *Borne Scrymser Co.* case was not such distillate, but the issues in the two cases are near enough alike to warrant, out of respect for the appellate court's conclusion, my concurrence in the conclusion of Judge Brown in this case.

In their original brief, counsel for the Government did not endeavor seriously to distinguish the instant case in *principle* from the *Borne Scrymser Co.* case, *supra.* In the brief filed by Brooks & Brooks as *amici curiae*, in support of the Government's position, however, a portion is devoted to discussion of an allegation that the trial court overlooked material distinctions between the *facts* of the present case and that case, and in their reply brief counsel for the Government followed generally the same line of argument on this point as that set forth by *amici curiae*.

These arguments we have quite carefully considered in the light of the records in the respective cases. The following facts are established:

The material involved in the *Borne Scrymser* case, *supra*, was a component element of crude petroleum. The first step toward its production, or segregation, was the distillation of the crude petroleum. This resulted in the segregation of the "lubricating fraction." The lubricating fraction was then refined by the use successively of sulphuric acid, alkali, and water. This produced a heavy lubricating oil and a thick, dark, tarry sludge. The heavy lubricating oil was then subjected to a sulphonating process by treating it with sulphuric acid, and two products resulted, (1) a clear, white, odorless mineral oil, and (2) the oil residue which was involved in the case.

The material involved in the instant case was a component element of crude petroleum. By distillation there was produced the "kerosene fraction." It contained, in the distilled form, naphthenic acid. The "kerosene fraction" was treated with caustic soda as a result of which there was produced, or segregated, sodium naphthenate. The sodium naphthenate was then treated with sulphuric acid.

It is not seen how this reversal of order in the use of refining agents can properly be held to distinguish the cases in *principle*. The trial court did not overlook the reversal of order in the use of refining agents, but made express mention of it, saying, referring to the *Borne Scrymser Co.* case, *supra:*

There an oily residue consisting chiefly of the alkali salts of sulphonated petroleum acids, used in the textile trade and for making emulsions, was treated in the reverse order than here used in order to get it by itself.. * * *

In other words, the merchandise involved in the *Borne Scrymser Co.* case, *supra*, was an element contained in the "lubricating oil fraction" as that fraction resulted from distillation, while the merchandise here involved is an element contained in the "kerosene fraction" as that fraction resulted from distillation. In both instances the particular products were segregated after distillation by refining, caustic soda and sulphuric acid being among the refining agents used. In one instance, the caustic soda, or its equivalent, was used first, while in the other, sulphuric acid was used first.

It seems clear to us that the rule applied with respect to the merchandise in the *Borne Scrymser Co.* case, *supra*, is equally applicable to the merchandise at bar, and that the latter is more specifically provided for in paragraph 1733, *supra*, than in paragraph 1, *supra*.

The judgment of the United States Customs Court is, therefore, *affirmed*.